Decided 24 February; rehearing denied 7 April, 1902.

## WILLARD v. BULLEN.

[67 Pac. 924, 68 Pac. 422.]

RIGHTS OF A SILENT PARTNER—PRIORITY OF CREDITORS.

1. A dormant partner will not be permitted to claim any part of the partnership property until creditors who did not know of his interest have been paid; as, for example, one who had a secret agreement with a company, by which he was to be a partner with it so far as the substructure of a certain bridge was concerned, but who acted ostensibly as an employe and agent of the company in superintending such substructure and in ordering materials and making contracts for it, the construction contract being an entire one, and in the name of the company, is estopped, as against the creditors of the company, from denying that it alone was interested in the contract; and his secret contract of partnership in the substructure work did not vest him with any title as against such creditors in the money due for the construction of the bridge.

LACHES—DISCRETION OF COURT.

2. The question whether one claiming payment out of a fund in litigation was guilty of laches in intervening to protect his claim, being within the judicial discretion of the trial court, its allowance of the claim will not be disturbed by the appellate court.

EQUITABLE ASSIGNMENT OF DEBT—EFFECT OF ORDER.*

3. An order upon a specified fund operates as an equitable assignment of a part of the fund, entitling the payee thereof to payment in full out of the fund to the exclusion of the general creditors of the drawer of the order, after its presentation to the holder of the fund: *McDaniel* ₦ *Maxwell,* 21 Or. 202, applied.

From Multnomah: JOHN B. CLELAND, Judge.

This is a controversy over the distribution of a balance due from the City of Portland to the Bullen Bridge Co. on the contract for the construction of Burnside Street Bridge. In September, 1892, the committee charged with the duty of constructing bridges across the Willamette River at Portland invited proposals for furnishing necessary material and labor for the erection of a bridge at Burnside Street in accordance with certain general plans and specifications theretofore adopted by the committee. Proposals were requested for the substructure, superstructure, and the entire work separately. In response thereto, C. A. & A. G. Bullen, partners doing business

*See, on this point, *Wadhams* v. *Inman,* 38 Or. 143.—REPORTER.

under the firm name of the Bullen Bridge Co., submitted a satisfactory proposal, and after due consideration the contract for the entire structure was awarded to them for the sum of $262,287.20. The plaintiff, an engineer experienced in substructure work, assisted the Bullens in making estimates and securing data for their bid, with the understanding that in case of its acceptance they and plaintiff should, as partners, do the substructure or foundation work, and share equally in the profits thereof. The plaintiff, however, was in no way known or represented in the contract, the arrangement between himself and the Bullens being private. The construction of the substructure and superstructure of the bridge proceeded simultaneously under the contract for the entire work in the name of the Bullen Bridge Co., and with it ostensibly as the sole contractor, the plaintiff having charge of the substructure work apparently as superintendent or engineer for the Bullens. The books of account were kept by the latter, all materials and supplies purchased and all labor employed in their name and on their account. All payments on the contract were received and disbursed by them, and, so far as the public was concerned they were the only parties interested in the matter. No material was purchased with an understanding that it was to be put into any particular part of the bridge, or on account of any one other than the Bullen Bridge Co. The bridge was completed in July, 1894, at which time there remained unpaid on the contract price the sum of $24,284.02, and the Bullens were indebted to divers and sundry persons, firms, and corporations for material and labor furnished and used in and about the construction of the bridge.

Prior to its completion, and on April 23, 1894, they borrowed of the Commercial National Bank $3,000 to use in paying for labor and material, giving as collateral security therefor an order on the Bridge Committee for $5,000, payable out of "the final estimate;" and at the time the bridge was completed they were indebted to the bank for money furnished for like purposes, which, with the sum previously borrowed, amounted to $10,000, for which they gave it an additional order on the

Bridge Committee for $5,000, payable on ''making final settlement.'' On the same day the bridge company gave orders to the North Pacific Lumber Co. and Kelly, Dunne & Co., for $7,500, and $677.48, respectively, payable out of the ''next estimate or payment due under the terms of the contract'' for materials furnished and used in the construction of the bridge, and an order to William Jacobson August 2, 1894, for $3,359.38, for labor and material furnished by him and used in the substructure. These orders were presented to and filed with the Bridge Committee about the time they bear date; but before any of them were paid, or the final settlement had, the plaintiff brought this suit against the Bullen Bridge Co., the Bridge Committee, and the persons in whose favor orders had been given, to enjoin the payment of any money to the Bullens or on such orders until the rights of the plaintiff as a partner in the substructure work had been adjusted and determined, asserting and alleging that of the money then unpaid $16,416.66 was due for substructure work, and that he was entitled to one half thereof, after the payment of certain debts contracted on account of such work, before the Bullens or the order claimants should be paid. Upon an *ex parte* application an injunction was issued, but subsequently, with the consent of the plaintiff as to the claims of Jacobson, the North Pacific Lumber Co., and Kelly, Dunne & Co., the Bridge Committee was authorized to and did pay the orders held by these several parties. Thereafter Honeyman, De Hart & Co., and the American Bridge Works were permitted to intervene, whereupon the former set up a claim of $1,092.71 for material furnished and used in and about the construction of the bridge, and the latter for a balance of $7,878.21 for iron, steel, and other bridge material sold and delivered to the Bullen Bridge Co. under a contract made with it before any work was done on the bridge. The order claimants appeared, and by answer set up their respective rights, and, issue having been joined between the parties, the cause was referred, with directions to the referee to report the law and the facts, pending which the American Bridge & Contract Co. was made a defendant, and answered,

setting up the fact that since the commencement of the suit it had recovered a judgment against the Bullens and the plaintiff, as partners, for the sum of $647.65. After the referee's report was filed, and on the 30th of November, 1897, an·order was made authorizing and directing the Bridge Commission to pay out of the funds then in its hands to the Commercial National Bank $6,090.61, the American Bridge Works $4,798.31, the American Bridge & Contract Co. $394.45, Honeyman, De Hart & Co. $655.50, and to the plaintiff $1,287.67, upon each filing a sufficient bond, conditioned that they will return to the clerk, upon the order of the court, the several sums by them respectively received, or so much thereof as may be ordered upon the final hearing, in case any of them shall be, by the circuit or appellate court, found entitled to a less sum.

Thereafter, and on the 27th of January, 1899, Edwin Thatcher intervened, with permission of the court, over the objections of the other defendants, and set up a claim for $3,481.42 for services in making plans and preliminary estimates, assisting the Bullen Bridge Co. in getting the contract, and as consulting engineer during the building of the bridge. Issue having been joined thereon and a hearing had on the motions to confirm the report of the referee and exceptions thereto, after consideration of the matter the trial court made and entered its findings and decree to the effect that the balance due the Bullen Bridge Co. should be distributed and applied: (1) To the payment of the costs and disbursements of the suit; (2) to the payment of such sums as the parties had stipulated should be disbursed from the fund during the progress of the suit: (3) to the orders drawn by the Bullen Bridge Co. upon the Bridge Commission in favor of the Commercial National Bank, $10,000, North Pacific Lumber Co., $7,500, Kelly, Dunne & Co., $677.48, and Jacobson, $2,870; (4) to the payment of $2,114.12, found by the court to be due the plaintiff as a partner with the Bullens in the substructure work, the same to be disbursed, however, first to the payment of $——— to plaintiff's counsel, and the remainder to be distributed *pro rata* between Thatcher and the American Bridge

& Contract Co.; and (5) the remainder of the fund, if any, to be applied *pro rata* to the payment of the claims of the other creditors of the Bullen Bridge Co. From this decree practically all the parties except Jacobson have appealed.

MODIFIED.

For Willard there was a brief over the name of *Cotton, Teal & Minor*, with an oral argument by *Mr. Wm. C. Bristol.*

For Commercial National Bank there was a brief over the name of *Platt & Platt*, with an oral argument by *Mr. Harrison Gray Platt.*

For Thatcher there was a brief over the names of *Wm. M. Gregory* and *Arthur C. Emmons*, with an oral argument by *Mr. Gregory.*

For American Bridge & Contract Co. there was a brief over the name of *Mitchell & Tanner*, with an oral argument by *Mr. Albert H. Tanner.*

For North Pacific Lumber Co., American Bridge Works, and Honeyman, De Hart & Co., there was a brief and an oral argument by *Mr. Thos. N. Strong.*

MR. CHIEF JUSTICE BEAN, after stating the facts, delivered the opinion of the court.

The record herein is somewhat complicated, and many questions have been discussed by counsel. In our opinion, however, the case can be determined by the application of a few well-settled principles of law. As we understand, the primary object of the suit is not to dissolve the partnership and take an accounting between plaintiff and the Bullen Bridge Co., for the purpose of ascertaining the amount, if any, due plaintiff from the Bullens. It does not seem to have been so regarded in the court below, and the Bullens have not appeared in this court, so that we shall not attempt at this time to state an account between them. Nor is it sought to charge the plaintiff,

as a partner, for debts contracted by the Bullen Bridge Co.
The real purpose is to ascertain and determine the rights of the
several parties to the record to the balance remaining due the
bridge company on its original contract with the City of Port-
land. Although the Bullens, in their answer, admit that the
plaintiff was a partner with them in the substructure work,
and was to bear half the expense and share equally in the
profits thereof, it is doubtful whether, under the facts disclosed
by the record, he can, as against the creditors, be regarded as
a partner, or in any other or different light than an employe,
who was to be compensated in part by a share in the profits of
that portion of the Bullen contract: *Voorhees* v. *Jones,* 29
N. J. Law, 270.

1. But, however that may be, he must, we think, be regarded
as a dormant partner, if a partner at all, under an agreement
by which he was to enjoy a portion of the profits, if any, upon
the substructure work, while his interest was practically con-
cealed from parties dealing with the bridge company. The
contract for the construction of the bridge was entire, and all
the business in relation thereto was conducted in the name of
and by the Bullen Bridge Co., with which firm alone the par-
ties to this litigation dealt, relying upon its personal credit and
the contract with the city. It is true, some of them were ad-
vised that the plaintiff had some interest in the substructure,
but they did not know that the work was being done by him
and the Bullens as partners separately from the other parts of
the bridge; on the contrary, his conduct was such as to induce
them to believe otherwise. He was in charge of the sub-
structure work, apparently as the agent and superintendent of
the Bullen Bridge Co., ordered material and made contracts
from time to time for and on its behalf and as its agent. In-
deed, much of the material purchased from the parties to this
litigation was so ordered. Having thus allowed the Bullen
Bridge Co. to be held out to the world as the sole party inter-
ested in the contract, and having thus permitted it to purchase
material and obtain credit on the faith thereof, he cannot now
be allowed to say that the property of the company and the

proceeds of the contract are not liable for the debts thus contracted. Under such circumstances it would be as repugnant to the principles of law as it is to the dictates of natural justice for him to be allowed to come in now and assert a claim to any part of the money arising under the contract superior to that of the material and labor claimants and others who relied upon the apparent interest and ownership of the Bullen Bridge Co. By remaining silent, and allowing the company to conduct the business as one entire contract, and to obtain credit on account thereof, he is estopped from denying that the bridge company was alone interested in the contract when the rights of third persons intervene. By his conduct he, in effect, disclaimed to those dealing with the bridge company that he had any interest in the contract which was superior or would take precedence over the debts contracted in its performance, and he is now bound by such representations.

"A partner cannot keep his membership secret," says Mr. Bates, "and afterwards be allowed to appear and embarrass creditors or persons who have acquired claims on the faith of the sole ownership of the ostensible partner": 1 Bates, Partn. § 155. And Mr. Justice CATON, in referring to this same question, says: "The law and the courts discountenance these secret trusts and partnerships as opening a wide door to the greatest frauds. Most effectually to prevent this, whenever the rights of third persons intervene, neither of the parties are permitted to assert the partnership, but the whole is considered as an individual transaction, and the property as belonging to the ostensible partner, unless the creditors choose to treat the dormant partner as interested. Indeed, I may say there is no partnership, only as between the parties themselves": *Talcott* v. *Dudley,* 4 Seam. 427, 438. And in *Lord* v. *Baldwin,* 6 Pick. 348, it is held that the attachment of a stock of goods in the hands of the ostensible partner in a suit against him alone has preference over a subsequent attachment of the same goods by another person in an action against the ostensible and the dormant partner, Mr. Chief Justice PARKER saying: "Even if he (the dormant partner) owned the whole of the stock, as

between him and the known man of business still it is in law
the property of the latter, for he is allowed to claim and use it
as his alone, and thus lead persons to trust him upon the faith
of the goods in his possession. * * The property then is not
the dormant partner's, to the prejudice of those who trust him
who carries on the business and obtains the credit.'' And in
*Cammack* v. *Johnson,* 2 N. J. Eq. 163, the suit was brought by
the dormant partner against the person in whose name the
business was conducted for an accounting and dissolution of
the partnership and to enjoin certain individual judgment
creditors from enforcing their claims against the partnership
property in preference to partnership debts, and the court,
after referring to and approving *Lord* v. *Baldwin,* 6 Pick. 348,
and *French* v. *Chase,* 6 Greenl. 166, say: ''The cases cited
arose on disputes between creditors; but in the case before me
the complainant, who asks the aid of the court, is himself the
dormant partner; and surely, if creditors cannot claim the
appropriation of partnership effects for payment of their de-
mands first, there is less reason for doing so at the instance of
the silent and unknown partner. The step is voluntary with
him. He chose to place himself in this position, and it is far
more just that he should suffer by it (however much that is to
be regretted) than innocent traders who have been kept in the
dark as to the true condition of things by his act. Upon the
creditors of the firm there is no other hardship than that which
occurs continually when one creditor is preferred by his debtor
over another. The law authorizes this preference, if obtained
by way of judgment, and it is practiced every day. Had there
been no partnership, they must have been postponed in their
demands by those judgments and executions; and there is no
good reason why the discovery of a partner at this late day
should, in justice and equity, change the rights or remedies of
any of the creditors.'' In *Allen* v. *Brown,* 39 Iowa, 330, it
was held that if, after making an overdraft at a bank, the
drawer takes a secret partner, who supplies money with which
subsequent deposits are made, they may be applied by the bank
to the prior overdrafts, on the ground that, so far as it was con-

cerned, the deposits were properly regarded as money of the ostensible partner. See, also, to the same effect, 17 Am. & Eng. Ency. Law (1 ed.), 931; *How* v. *Kane,* 2 Pin. 531 (54 Am. Dec. 152); *Brown's Appeal,* 17 Pa. 480; *Callender* v. *Robinson,* 96 Pa. 454; *Van Valen* v. *Russell,* 13 Barb. 590. Within the doctrine of these authorities, the contract between the plaintiff and the Bullens that he should be a partner in the substructure work did not vest him with any title or ownership as against creditors of the bridge company in the money due from the city for the construction of the bridge, or any part thereof. That partnership was an affair between himself and the Bullens, by which the creditors of the latter cannot be prejudiced. The money due upon the contract for the construction of the bridge is the assets of the Bullen Bridge Co., to which the plaintiff has no claim until all the debts incurred by it on account thereof have been paid.

2. The remaining question is one of priority between the several creditor claimants. Objection to the intervention of Thatcher was made on the ground of *laches*; but that was a matter within the judicial discretion of the trial court, and we do not think its conclusion ought to be disturbed.

3. The orders in favor of the Commercial National Bank, the North Pacific Lumber Co., Kelly, Dunne & Co., and Jacobson operated as an equitable assignment of a part of the fund (*McDaniel* v. *Maxwell,* 21 Or. 202, 27 Pac. 952, 28 Am. St. Rep. 740; *Erickson* v. *Inman,* 34 Or. 44, 54 Pac. 949), and gave to these order claimants a prior right to be paid out of such fund before the general creditors. As there is sufficient money to pay all of these orders in full, it is unnecessary to consider the question of priority as between the holders thereof.

The other parties to the suit, standing in the position of general contract creditors of the Bullen Bridge Co. with equal equities, are entitled to share *pro rata* in any surplus that may remain after the order claimants have been paid. Under the order of distribution made by the trial court on December 10, 1897, the Commercial National Bank did not receive the

41 OR.—3.

full amount to which it was entitled, and the general creditors received the excess. According to the terms of such order, they will be required to return to the clerk of the court below a sufficient amount of the money paid to them to make up the balance due the bank; and, as they have had the benefit of the money, and the bank has been denied the use thereof, it is equitable and just that they should pay interest thereon.

A decree will be entered here in accordance with the views expressed in this opinion.　　　　　　　　　　Modified.

Decided 7 April, 1902.

On Motions for Rehearing.

Mr. Chief Justice Bean delivered the opinion.

After a careful re-examination of the case, the court adheres to the views expressed in its decision heretofore given, as to the proper distribution of the fund in the hands of the Bridge Committee at the time the suit was commenced, the reasons for which are given in the opinion already filed, and need not be restated. The pleadings admit, however, that, as between themselves, the plaintiff and the Bullens were partners in the substructure work, and entitled to share equally in the profits thereof. The plaintiff, therefore, asks that such partnership be dissolved, and that he have a decree against the Bullens for his share of the profits. The entire sum paid and agreed to be paid by the city for the substructure work, according to the finding of the trial court and the evidence, was $128,969.52. The actual cost thereof to the plaintiff and the Bullens is difficult to ascertain. No settlement or accounting was ever had between them, and no partnership books were kept. The only books of account were those of the bridge company, containing all their business transactions. No separate account was kept of the substructure work, although an account of the expense of constructing the different portions of the bridge is shown by the books. It is therefore difficult to determine, with any reasonable degree of accuracy, the actual cost of the substructure; but from the testimony of the parties,

in connection with the books, we are of the opinion that the result arrived at by the court below, with the exception of the item of $500 for securing the contract, and the judgment of $647.65 in favor of the American Contract Co., is substantially correct. The charge of $500 as expenses incurred by the Bullens in securing the contract ought not to be allowed, because the items of such expenditure are not given, and the Bullens refused to make any satisfactory explanation thereof. The judgment in favor of the American Contract Co. has never been paid, and is still an outstanding obligation against plaintiff and the Bullens, and ought not to be charged in this accounting as a part of the cost of construction. Eliminating the two items referred to, the profit on the substructure would. be $12,590.17. As the plaintiff drew from the firm during the progress of the work $3,607 more than he paid in, the balance due him would therefore be $2,688.08. This amount he is entitled to recover from the Bullens. The several petitions for rehearing are denied.                REHEARING DENIED.