Argued July 13, reversed and remanded with instructions
November 8, 1967

# WILLAMETTE PRODUCTION CREDIT ASSO-CIATION, *Appellant, v.* MORLEY ET AL, *Respondents.*

433 P. 2d 239

*T. W. Churchill,* Salem, argued the cause for appellant. With him on the brief were McKinney & Churchill, Salem.

*John A. Bryan,* Salem, argued the cause for respondents. With him on the brief were DeArmond, Sherman & Barber, Salem.

Before PERRY, Chief Justice, and McALLISTER, O'CONNELL, HOLMAN and LUSK, Justices.

HOLMAN, J.

Plaintiff brought this suit to declare fraudulent and void a conveyance of real property from Elmer and Alice Morley to defendants Dolph and Hazel Morley. Plaintiff is a judgment creditor of Elmer and Alice Morley. The trial court entered a decree in favor of defendants and plaintiff appeals. Because the primary controversy is the proper inference to be drawn from the testimony, a more detailed statement of the testimony is necessary than is usual.

On May 6, 1952, Dolph and his brother, Elmer, as partners, purchased the real property in question which was 225 acres of farm land known as Twin Hills Ranch. They purchased it on contract in Elmer's name. The purchase price was $20,000. All payments were made as agreed except the final one of $13,500, which was due May 6, 1962.

Shortly after the purchase of the property Dolph moved upon Twin Hills, repaired the residence at his own expense, lived there and farmed the land for the benefit of the partnership. The cost of the repairs is in doubt as no one kept a record. Dolph estimated the cost to be $8,000, but had no other proof of the amount. Elmer did not as actively engage in the physical work of farming the ranch as he was otherwise employed. Elmer handled all business for the venture in his name and gave Dolph what he needed for living expenses,

the money coming partially from Elmer's salary from other employment. The extent to which Elmer contributed to Dolph's support from his private funds is unknown. The partners at no time mentioned herein ever had an accounting of any kind, or apparently ever kept any substantial records.

Thereafter, in April of 1956, Dolph and Elmer entered into a written agreement purporting to terminate their partnership as of January 1, 1955. The agreement was as follows:

## "A G R E E M E N T

"THIS AGREEMENT made and entered into by and between DOLPH MORLEY, hereinafter known as party of the first part, and ELMER MORLEY, hereinafter known as party of the second part,

### "W I T N E S S E T H:

"THAT WHEREAS, the parties hereto have heretofore and prior to January 1, 1955, been partners and

"WHEREAS, such partnership was dissolved as of January 1, 1955, and

"WHEREAS, since January 1, 1955, the party of the first part has been employed by the party of the second part and it is the intention to continue such employment until such time as the farming operation shall make sufficient profit to allow each of the parties hereto to draw sufficient sums upon which to live, and

"WHEREAS, it is agreed that the compensation to be paid the said Dolph Morley for the year 1955 was fixed as of December 31, 1955, in the amount of $4,000.00, less Social Security in the amount of $80.00 and state withholding in the amount of $40.00, now therefore

"IT IS AGREED that the party of the second part does hereby hire the party of the first part to perform services for the party of the second part in connection with the farming operation of the party of the second part.

"It is further agreed that at such time as the farming operation of the party of the second part shall permit sufficient withdrawals from the profits therefrom to provide the living expenses of the party of the first part and the party of the second part, then the party of the second part, in consideration of the family relationship between the parties and in consideration of the party of the first part's not seeking employment elsewhere, agrees to give and grant unto the party of the first part a one-half interest in and to the farming machinery and equipment now owned by the party of the second part and, in addition thereto, shall give to the party of the first part a one-half interest in and to the Twin Hills Ranch consisting of approximately 255 acres and the old Sneed farm consisting of approximately 92 acres subject to any mortgage or encumbrances thereon.

"It is agreed that in the event of the death of the party of the second part prior to such time, then the right of the party of the first part in and to such one-half interest shall immediately fix and determine and become vested."

\* \* \* \* \*

Elmer simultaneously drew a will in which, at his death, he recognized Dolph as a one-half owner of the farm machinery, Twin Hills Ranch, and the Sneed farm mentioned in the agreement.

On July 22, 1962, a suit was brought against Elmer by the sellers for the foreclosure of the Twin Hills contract. Elmer had been unable to make the final payment due May 6, 1962, and could borrow no money to refinance the purchase because of his current in-

debtedness to plaintiff for crop loans in the sum of $48,500. These loans were incurred in the operation of Twin Hills, the Sneed farm and farming ventures of Elmer's on other property. Dolph had at all times continued to live on Twin Hills and farm it.

On July 30, 1962, Elmer deeded Twin Hills to Dolph and his wife who could borrow sufficient money on Twin Hills to pay off the contract. Dolph borrowed $18,000 from the defendants Cook for this purpose. The sum over $13,500 was necessitated as the result of interest, court costs and attorney's fees. All parties to this litigation agree that the defendants Cook have a mortgage for this amount on Twin Hills which is prior to any rights of plaintiff. The value of Twin Hills at the time of the transfer to Dolph was testified by Dolph to be $40,000 to $45,000, by Elmer to be $50,000 to $60,000, and by an apparently disinterested witness, the manager of the Federal Land Bank for Marion, Polk and Yamhill counties, to be $48,000. Elmer testified a real estate broker told him he had an offer of $30,000 plus a boat for Twin Hills, and that he talked it over with Dolph and Dolph did not want to sell because he thought the property was worth more and he wanted to keep it. Dolph did not deny this.

The farm machinery and the Sneed farm were sold by Elmer and the net proceeds were applied on his indebtedness to plaintiff. Late in 1963 or early in 1964, plaintiff commenced a suit to collect the balance of Elmer's indebtedness and to foreclose mortgages on other real and personal property in Elmer's name. This resulted in a judgment of $26,540.21, of which $18,351.44 remained unsatisfied after the sale of the security and at the time of the commencement of this suit.

Plaintiff's manager knew of Elmer's interest in Twin Hills but he testified he did not take a mortgage upon it because he found it was being purchased on contract and therefore, he was doubtful whether the mortgage would be good. As a consequence he took other property as security. He further testified Elmer told him he was going to try and sell Twin Hills and apply the proceeds on plaintiff's indebtedness. At the time of making the loans to Elmer, plaintiff knew nothing of any interest Dolph might have in Elmer's farming venture, nor is there any indication that it had any such knowledge at the time it secured the judgment against Elmer.

Dolph claims there was adequate consideration for the transfer of the property to him and that it was, therefore, bona fide. He contends he already had a one-half interest in the equity in the property, that he had invested money of his own both in improving the property and in making payments upon it, and that the remaining value was covered by the cancellation of the indebtedness owed him by Elmer for delinquent wages earned in doing farm work for Elmer under the contract.

Because of Dolph's contentions it becomes important to determine the relationship between Elmer and Dolph resulting from the written agreement and the manner in which the brothers handled Twin Hills. The following is Elmer's testimony concerning the intended effect of the written agreement purporting to terminate the partnership:

\* \* \* \* \*

"Q All right. Then as of that time, January 1, 1955, does this document speak correctly, then, in that you considered that the partnership was dissolved as of that time?

"A Well, that was the reason we drew it up. We didn't—I can't hardly answer that question yes or no, because we dissolved it by this agreement, but we didn't dissolve it actually. I mean that we still went on as we had before.

"Q Would you explain that a little bit more; I don't quite follow what you. You say you dissolved the partnership by this agreement but that you didn't actually dissolve it. What do you mean by that?

"A Well, we went on working on the farm just the same as we always had, and under the same conditions, to the best of my knowledge and belief."

＊　　＊　　＊　　＊　　＊

"Q Did you owe him, Dolph, anything as of July 30, 1962?

"A Well, I didn't think that I did."

＊　　＊　　＊　　＊　　＊

Elmer also testified that the reason for the agreement was for the purpose of simplifying record-keeping and income tax responsibilities.

Dolph testified as follows relative to the agreement's effect:

"Q But at the time your brother gave you the deed you considered that you had a half interest and he had a half interest.

"MR. DEARMOND: Do you mean at the time of or prior to the time of the deed?

"MR. CHURCHILL: Yes, just prior to the deed, which would be on the 29th.

"A Yes."

＊　　＊　　＊　　＊　　＊

Thus Dolph was apparently under the impression that the provision of the contract was of no effect which vested his one-half interest in the property only when

it would support both brothers, or when Elmer would die. Two contingencies, neither of which occurred.

While a monthly salary for Dolph's supposed employment under the contract was agreed upon, things continued as before. Payments to Dolph for living expenses continued to be what Elmer was able to pay. Though purported delinquencies in Dolph's salary existed from sometime in the year 1956 to July of 1962, Dolph presented no bill to or demanded any accounting from Elmer. At the commencement of trial neither Dolph nor his wife knew how much the claimed delinquency was. At the time of the transfer of the property to Dolph no memorandum or receipt was given showing that any claim for wages was satisfied. No revenue stamps appear on the deed as evidence of consideration.

Elmer testified that at the time of the property's transfer to Dolph he intended to retain his interest but nothing was said concerning it. Dolph denied that it was intended that Elmer would retain any interest.

We conclude that the over-all picture is one of brothers who had an informal partnership farming venture conducted in Elmer's name. We believe that the written agreement, which purported to terminate the partnership and provide that Dolph was Elmer's employee, was never intended to change the parties' rights or obligations as between themselves. It was for the purpose of simplifying records and tax returns and was otherwise apparently wholly ignored by the parties. It is our opinion that Elmer and Dolph continued to be partners without substantial change at all times prior to the transfer of the property to Dolph, and that they continued to be equal owners of Twin Hills despite the provisions of the written agreement.

Nor do we believe that Dolph was Elmer's employee and that the purported balance of Dolph's wages was a bona fide obligation of Elmer's.

■ Dolph's position seems to be that he wishes to assert the written agreement in attempting to establish his position as Elmer's employee with a resultant status as Elmer's creditor, and at the same time assert that at all times he was a half-owner of Twin Hills, which necessitates ignoring that part of the agreement which provides that his interest should not vest until such time as Elmer should die or the venture be operated profitably enough to support both families. He cannot assert part and ignore the rest.

If the property was worth $48,000, as the evidence indicates, there was a $30,000 equity after deducting the $18,000 needed to pay off the contract. Half of this equity was Elmer's. There was no monetary consideration for the transfer of Elmer's equity to Dolph and his wife. The wages which Dolph sought to offset were not bona fide. Dolph cannot offset the money he invested in the property. It was part of his contribution for his half-interest therein. There has never been any accounting between the brothers or any indication prior to the transfer, other than the purported agreement, that they considered themselves other than equal contributors and owners. No one claims that Elmer was making Dolph a gift.

■ We believe that it was not intended by the brothers that the beneficial interest in the ownership be changed by the transfer. The brothers did not want to sell the property and by transferring it into Dolph's name it could be refinanced. We hold that Elmer and Alice are the beneficial owners of a half-interest.

■ It matters not whether a motivating influence for the transfer was the avoidance of Elmer's creditors.

The transfer was fraudulent in any event. Where an insolvent debtor conveys to a grantee with a trust secretly reserved to himself, and the grantee has notice of the debtor's financial condition, even when there is consideration the conveyance is fraudulent as a matter of law, although the actual intention of the parties may have been honest. *Connel v. O'Connor,* 159 Or 348, 354, 80 P2d 542 (1938); *Jolly v. Kyle,* 27 Or 95, 101, 39 P 999 (1895); 1 Glenn, Fraudulent Conveyances 526, & 299(c) (rev ed 1940). In *Jolly* the court said:

"* * * All property that is not exempt from execution is, in equity, pledged by the debtor to his creditors for the payment of his debts; and when a debtor, as a part of the consideration for a conveyance, secretly secures to himself any substantial interest or benefit to be derived from the estate granted, such conveyance is constructively fraudulent. * * *"

A relevant inquiry is whether Dolph's interest in the property should also be subject to plaintiff's judgment against Elmer. Dolph allowed Elmer to conduct the partnership business in Elmer's name. If the money borrowed by Elmer was used for partnership purposes why should not the entire property, which was in Elmer's name at the time the money was borrowed, be subject to the indebtedness? There is no doubt that part of the borrowed money was used for partnership purposes. However, no inquiry was made concerning any segregation and therefore it is impossible to tell from the record what portion of the borrowed money was so used and what part was used in other farming operations of Elmer's in which Dolph had no interest. There is no necessity, therefore, to further pursue the problem. If we could find as a fact that plaintiff relied upon Elmer's ownership of Twin

Hills in extending credit the result might be otherwise.

 Another relevant inquiry is whether the following language from the Uniform Partnership Law, ORS 68.420(2)(c) has any effect on our problem:

> "A partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership. * * *"

The purpose of the provision is to prevent disruption of partnership affairs by the creditor of an individual partner. Crane, Partnership § 43 (2d ed 1952). A considerable but unascertained part of the borrowed money was used for partnership purposes. The partnership borrowed funds through Elmer as an individual and the plaintiff reduced both the individual and partnership indebtedness to a single judgment without notice of the partnership, and attempted to levy on what turned out to be the judgment-debtor's interest in partnership real property. In this situation neither partner is in a position to assert the protection of the statute to prevent disruption of the partnership affairs. The partners created the situation which induced plaintiff to deal with and sue Elmer as if he were an individual for both individual and partnership obligations without segregation. Partners cannot keep the existence of the partnership secret and later claim the protection afforded partnerships. Cf. *Willard v. Bullen*, 41 Or 25, 31, 67 P 924, 68 P 422 (1902).

The decree of the trial court is reversed and the transfer to Dolph and Hazel Morley of the half interest in Twin Hills belonging to Elmer and Alice Morley is set aside. This half interest is directed to be sold upon execution and the proceeds applied to the satisfaction of plaintiff's judgment.