PORTLAND FLOURING MILLS CO. v. PORTLAND & ASIATIC S. S. CO. et al.

(District Court, D. Oregon. March. 19, 1906.)

No. 4,800.

1. SHIPPING—LIEN FOR FREIGHT—EFFECT OF EXPRESS RESERVATION.
    A provision of a bill of lading issued by a steamship company that "the carrier shall have a lien on the goods for all freights, primages, and charges" does not affect or change the nature of the lien, which is simply

the maritime lien as understood in the jurisprudence of the United States, to preserve which the retaining of possession is essential, although such provision may in some cases preserve the lien where it would otherwise be deemed waived by other provisions relating to the time and manner of paying the freight.

2. SAME—WAIVER.

The usual provision of a bill of lading that the cargo shall be delivered to the person named or his assigns, "he or they paying the freight," is designed for the benefit of the owner or master in recognition of his right to a lien, and does not impose on him the duty of insisting on payment of the freight before delivery, but he is free to waive his lien and hold the shipper therefor.

3. SAME—PAYMENT BY SURETY—RIGHT OF SUBROGATION.

Libelant, as shipper of a cargo of flour, became bound for the freight, but only as surety for the consignees, who were the owners of the cargo and primarily liable for the freight. The vessel having stranded, her owner abandoned her to the insurer as well as the cargo, a portion of which was salved and sold and the proceeds received by respondent, which was its insurer. Subsequently the insurer of the freight recovered the same from libelant, which thereupon brought suit to recover the amount from respondent, claiming to be subrogated to the carriers' lien for the freight upon the cargo and its proceeds. *Held*, that such lien was lost by the abandonment of the cargo to respondent, which the carrier had the right to make, and there was therefore no claim against the fund arising therefrom to support a right of subrogation.

## In Admiralty. On exceptions to libel.

After stating that the several companies parties to this proceeding were incorporated, the libel proceeds in effect as follows:

About August 29, 1901, libelant entered into a contract with a Chinese syndicate at Hong Kong, China, for the sale and shipment of 40,000 barrels of flour during the months of September, October, November, and December following, to be delivered by libelant on board ship at Portland, Or., or on Puget Sound; the buyers to pay the freight, as the respondent Portland & Asiatic Steamship Company well knew; insurance to be effected by libelant upon the flour at buyers' expense, and payment to be made by drafts drawn upon buyers at 60 days' sight, through the Chartered Bank of India, Australia & China, with bills of lading and insurance policies attached. During December, 1901, libelant, at Portland, Or., delivered on board the steamship Knight Companion, chartered and operated by the Portland & Asiatic, certain flour, namely: 98,000 pounds to be delivered to libelant, or its assigns, at Hong Kong, China, "Notify Wing Chong Lee"; 1,060,654 pounds, same delivery, "Notify Kwong Tuck Wing"; 2,121,112 pounds, same delivery, "Notify Kwong Yick Woo"; and 3,181,766 pounds, same delivery, "Notify Wing Chong Lee." For each of such shipments the Portland & Asiatic issued and delivered to libelant bills of lading, which contained provisions, among others, as follows: (1) That the freight was to be paid thereon at the rate of $5 per ton of 2,000 pounds, gold, at Hong Kong; (2) that such freight was to be collected in United States gold coin or its equivalent at the point of destination and delivery; (3) that the carrier shall have a lien on the goods for all freights, primages, and charges; (4) that if, on a sale of the goods at destination for freight and charges, the proceeds fail to cover said freight and charges, the carrier shall be entitled to recover the difference from the shipper; (5) that the bill of lading duly indorsed must be given up to the ship's consignee in exchange for delivery order; (6) the several freights and primages to be considered as earned, steamer or goods lost or not lost, at any stage of the entire transit.

In truth and in fact, as between libelant and the buyers, the freight upon such shipments was to be paid by the buyers, of which the Portland & Asiatic had knowledge prior to the issuance of such bills of lading, and the words "Notify," etc., were intended, as between the Portland

& Asiatic and libelant. to designate the respective persons to whom the flour was to be delivered. Insurance upon the flour was effected by libelant, in the name of itself and assigns and in amount representing invoice cost and 40 per cent., with respondent Commercial Union Assurance Company, in accordance with buyers' instructions and at their expense. At and prior to time of delivery aboard ship, respondents well knew that libelant had sold such flour to the buyers, delivery on board said vessel at Portland, and that the freight thereon from Portland to Hong Kong was for buyers' account, the Portland & Asiatic having agreed to collect such freight from buyers at Hong Kong upon arrival of steamer and delivery of flour, and the respective bills of lading having been issued in pursuance of such agreement. Libelant indorsed the bills of lading and insurance policies, and attached the same to the drafts drawn upon the respective buyers for the invoice cost of such flour and insurance premiums advanced for buyers' account, and caused such drafts to be forwarded to the Chartered Bank of India, Australia & China, at Hong Kong.

About February 2, 1902, on the Japanese coast, the Knight Companion, laden with such shipments, grounded and stranded, and, together with her cargo, was immediately abandoned by her master and crew, without any necessity therefor and without any attempt at salvage of her cargo, or any notification to libelant; the said ship being abandoned to the underwriters thereof as a total loss. Salvage of cargo was begun by Japanese fishermen. and about February 6, 1902, one Rennie Tipple, the surveyor to Lloyd's agent and local underwriters, took charge of the operations, which resulted in the salvage of a large portion of the flour so shipped by libelant. The salved flour was sold under authority of a meeting of local agents of underwriters February 26, 1902, and the proceeds thereof deposited with the Yokohama Specie Bank, to the joint credit of Samuel Samuel & Co., who were the Japanese agents of the Portland & Asiatic, and H. R. Playfair, who was the Japanese agent of the assurance company, and the net proceeds of the flour so shipped by libelant and so salved, after deducting expenses of salvage, amounted to $21,447.98, which said sum was largely in excess of freight upon the entire shipment. In the price at which said salved flour was sold was included a freight value of $5 per ton. No abandonment of such flour was ever made by libelant to insurers, nor was libelant ever notified by the Portland & Asiatic of the loss of the ship, or of the salvage of such flour; and, at the time of such salvage, sale, and deposit, said bills of lading and such policies were in the possession of the Chartered Bank of India, Australia & China at Hong Kong, and libelant had never consented to such sale. nor was it advised thereof.

About June 25, 1902, the British & Foreign Marine Insurance Company, to which, as insurer of the freight on the Knight Companion, the Portland and Asiatic had, on March 20, 1902, abandoned such freight, brought suit in this court against libelant for the recovery of $16,376.51, being the freight upon such shipment made by libelant, and such proceedings were had that, on November 21, 1904, a final decree was rendered in favor of said insurance company against libelant, in a sum with interest and costs aggregating $19,- 391.61. On December 7, 1904, libelant was compelled to, and did, pay the decree, and has since endeavored to collect the amount from the said Chinese consignees of the flour. but has been, and still is, unable to do so in any part. The Portland & Asiatic and the assurance company, by their respective agents, on November 4, 1902, wrongfully converted to the use of, and paid over to, said assurance company the proceeds of the said salved flour, which moneys constituted a fund out of which said freight could, and the libelant was claiming it should, be paid, as both the respondents well knew. The libelant, by and under said former suit, has been compelled to pay moneys which said Chinese buyers should have paid, as the respondents at all times well knew, and which libelant is unable to secure to be paid by the said Chinese buyers. The respondent assurance company claimed and received said salved flour, and the proceeds thereof, claiming to be subrogor or assignee of said Chinese consignees,. and not otherwise; and, by the claim and receipt of said moneys, said assurance company itself became

145 F.—44

liable for, and obligated to pay to libelant, the moneys which the libelant was compelled to pay as aforesaid, but which in truth and in fact should have been paid by said consignees. Wherefore libelant prays that the court pronounce in favor of its demand. Respondents have each interposed three exceptions. The first challenges the libel on its merits. The other two suggest indefiniteness and uncertainty.

Williams, Wood & Linthicum and J. C. Flanders, for libelant.
Snow & McCamant, for respondents.

WOLVERTON, District Judge (after stating the facts). In the view I entertain of the matters presented, it will be necessary to consider the first exception only. A disposal of that will determine the cause on its merits.

Plaintiff's theory of the libel is as well expressed as could be by its counsel in their brief submitted with the argument. I quote as they state it:

"Our claim against this fund arises from the doctrine of subrogation, that is to say, having paid the Portland & Asiatic, or its assigns, the freight, which, as between the Chinamen and ourselves, was due from the Chinamen, we are subrogated to the rights of the Portland & Asiatic against the Chinamen themselves and against the salved flour or its proceeds, and the respondent, the Commercial Union Assurance Company, limited, having acquired possession of this fund by subrogation from the Chinamen, hold it subject to all the claims and liens against it which would have subsisted in the hands of the Chinamen; that, it being true in the law of subrogation that he who has paid to a creditor the debt of another is subrogated to all the rights of that creditor against that other, and that he who takes by assignment the right of another to a fund takes it with all the burdens and obligations which that fund would have been chargeable with in the hands of his assignor, it is in legal theory the same as if the Portland & Asiatic in this present suit were seeking to make its freight money out of the flour itself in the hands of the Chinamen."

Under the allegations of the libel and the exposition of the libelant's theory, the Chinamen must be treated as though they were the actual principals for the payment of this freight money to the Portland & Asiatic and the libelant their surety, although the bills of lading would indicate that the parties sustain the reverse relation; but the Portland & Asiatic, having knowledge of such relations, is bound to the observance of such obligations as would arise on the assumption that they actually existed. This is not a matter that was tried and determined in the former suit of the British & Foreign Marine Insurance Company against the libelant, although the result of that suit leads one to doubt the correctness in fact of libelant's hypothesis here. But be that as it may, I am warranted in putting the contention of res judicata made by the respondents out of the case at the outset, and considering the questions arising, giving libelant all the benefits it is legally entitled to under the theory advanced.

For a clear understanding of what is to follow, it should be premised that, generally speaking, subrogation in equity arises under the following conditions: First, the person insisting upon its benefits must have paid a debt due to a third party before he can be substituted to that party's rights; and, second, in doing so he must not act as a mere volunteer, but on compulsion, to save himself from

loss by reason of a superior lien or claim on the part of the person to whom he pays the debt, as in cases of sureties, prior mortgagees, etc. The right is never accorded to one who is a mere volunteer in paying the debt of one person to another. See Ætna Life Insurance Co. v. Middleport, 124 U. S. 534, 8 Sup. Ct. 625, 31 L. Ed. 537, from the syllabus of which case the legal statement is largely taken. A very clear enunciation of the doctrine itself is made by Chancellor Johnson, in Gadsen v. Brown, Speer's Eq. (S. C.) 37, 41, cited in the above case. He says:

"The doctrine of subrogation is a pure unmixed equity, having its foundation in the principles of natural justice, and from its very nature never could have been intended for the relief of those who were in any condition in which they were at liberty to elect whether they would or would not be bound; and, as far as I have been able to learn its history, it never has been so applied. If one with the perfect knowledge of the facts will part with his money, or bind himself by his contract in a sufficient consideration, any rule of law which would restore him his money or absolve him from his contract would subvert the rules of social order. It has been directed in its application exclusively to the relief of those that were already bound who could not choose but abide the penalty."

So has Chancellor Walworth spoken, in the case of Sandford v. McLean, 3 Paige (N. Y.) 122, 23 Am. Dec. 773, also cited in the above case:

"It is only in cases where the person advancing money to pay the debt of a third party stands in the situation of a surety, or is compelled to pay it to protect his own rights, that a court of equity substitutes him in the place of the creditor, as a matter of course, without any agreement to that effect."

See, also, a reaffirmation of the doctrine as announced in Ætna Insurance Co. v. Middleport, in Prairie City Bank v. United States, 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 412.

So that, in order for libelant to prevail, it must have been surety for the Chinamen for the payment of the freight money to the Portland & Asiatic, a condition which may be conceded for the sake of the consideration of the case. Further, in the aspect in which libelant puts it, the Portland & Asiatic must have had a lien upon the cargo of flour, or the proceeds thereof, when the freight money was paid to it by libelant, and the libelant must have paid such money, not as a volunteer, but because it was bound to pay the same in its relation as surety for the Chinamen. If all these things existed seriatim, then the libelant was subrogated to the rights of the Portland & Asiatic under its lien, and is entitled to the same relief that the Portland & Asiatic would have had had it pursued the lien as a remedy for making its freight money. If not, the basis of libelant's theory is wanting, because it has no existence in fact, and it is not entitled to the relief demanded.

The lien relied upon, through which subrogation is claimed, is the shipowner's lien for freight for the carriage of goods. Such lien depends upon possession, and its preservation upon a continuance of possession. Scrutton on Charter Parties & Bills of Lading, arts. 149, 150, 136. A clear statement of the nature of the lien is made by

Mr. Chief Justice Taney, in the case of Bags of Linseed, 1 Black, 108, 112, 113, 17 L. Ed. 35. He says:

"Undoubtedly the shipowner has a right to retain the goods until the freight is paid, and has, therefore, a lien upon them for the amount; and, as contracts of affreightment are regarded by the courts of the United States as maritime contracts, over which the courts of admiralty have jurisdiction, the shipowner may enforce his lien by a proceeding in rem in the proper court. But this lien is not in the nature of a hypothecation, which will remain a charge upon the goods after the shipowner has parted from the possession, but is analogous to the lien given by the common law to the carrier on land, who is not bound to deliver them to the party until his fare is paid; and, if he delivers them, the incumbrance of the lien does not follow them in the hands of the owner or consignee. It is nothing more than the right to withhold the goods, and it is inseparably associated with his possession, and dependent upon it. The lien of the carrier by water for his freight, under the ordinary bill of lading, although it is maritime, yet it stands upon the same ground with the carrier by land, and arises from his right to retain the possession until the freight is paid, and is lost by an unconditional delivery to the consignee. It is suggested in the argument for the appellant that, as a general rule, maritime liens do not depend on possession of the thing upon which the lien exists; but this proposition cannot be maintained in the courts of admiralty of the United States. And, whatever may be the doctrine in the courts on the continent of Europe, where the civil law is established, it has been decided in this court that the maritime lien for a general average in a case of jettison, and the lien for freight, depend upon the possession of the goods, and arise from the right to retain them until the amount of the lien is paid"—citing Cutler v. Rae, 7 How. 729, 12 L. Ed. 890, 1221; Dupont de Nemours & Co. v. Vance and Others, 19 How. 171, 15 L. Ed. 584.

"Hypothecation, when applied to maritime transactions," it is said, "is perhaps about the same as bottomry or respondentia, though it is usually predicated of a loan by the master on the vessel, freight, or cargo, made in order to raise money for the necessities of the voyage. In a more general sense, it is a pledge to secure any debt or engagement without a delivery or possession." 15 Am. & Eng. Enc. (2d Ed.) 905. This definition renders the distinction intended to be made by the distinguished jurist by the use of the term "hypothecation" very obvious, and it emphasizes the condition contained in the rule that the shipowner's lien for the carriage of goods, or for freight money, is one dependent upon possession, and that when the possession is lost the lien ceases to be available.

So in a later case, The Bird of Paradise, 5 Wall. 545, 555, 18 L. Ed. 662, Mr. Justice Clifford says:

"Such a lien is regarded in the jurisprudence of the United States as a maritime lien, because it arises from the usages of commerce, independently of the agreement of the parties, and not from any statutory regulations. Legal effect of such a lien is that the shipowner, as carrier by water, may retain the goods until the freight is paid, or he may enforce the same by a proceeding in rem in the District Court. But it is not the same as the privileged claim of the civil law, nor is it an hypothecation of the cargo wi·h will remain a charge upon the goods after the shipowner has parted unconditionally with the possession. Although the lien is maritime and cognizable in the admiralty, yet it stands upon the same ground with the lien of the carrier on land, and arises from the right of the shipowner to retain the possession of the goods until the freight is paid, and is lost by an unconditional delivery to the consignee."

These are sufficient of the cases to establish in maritime jurisprudence the legal character of the lien. The circumstance that it is specifically stipulated in the bill of lading "that the carrier shall have a lien on the goods for all freights, primages, and charges" does not affect or change the nature of the lien with which the goods are incumbered. It is simply the maritime lien, as understood by the jurisprudence of the United States, with the usual effect and limitations which the law ordinarily implies, that is preserved and confirmed by the express agreement of the parties, and none other. The agreement does not constitute a hypothecation whereby the lien attaches and continues effective without reference to the condition of possession essential to the ordinary maritime lien on the cargo for freight charges. It has an advantage, however, in its favor that does not affect this case. Being express, such agreement may at times, dependent upon the nature of the stipulations imposed, evidence an intention adverse to a waiver where otherwise the lien might be deemed, under the usual conditions attending the bill of lading, to have been renounced. "If there is an express stipulation for a lien for freight," say the authors of the American and English Encyclopedia (volume 7 [2d Ed.], p. 275), "such lien may be considered as preserved to the shipowner, notwithstanding there are in the contract of affreightment provisions as to the time and place of the payment of freight which might otherwise be construed as showing an intention on the part of the shipowner to waive his lien." In further support of the view thus indicated, see The Bird of Paradise, supra; The Kimball, 3 Wall. 37, 18 L. Ed. 50; The Volunteer, Fed. Cas. No. 16,991, 28 Fed. Cas. 1260; Fourteen Horses, etc., Fed. Cas. No. 4,990, 9 Fed. Cas. 602; Howard et al. v. Macondray et al., 7 Gray (Mass.) 516.

The insertion of the usual clause in bills of lading that the cargo is to be delivered to the person named, or his assigns, "he or they paying the freight," is designed for the benefit of the master or shipowner, and not for that of the shipper or consignor, and is but a recognition or assertion of the former's right to retain the goods carried until his lien is satisfied by payment of the freight. It therefore imposes no obligation on the master or owner to insist on the payment of the freight before delivery of the cargo. If he prefers to waive his right of lien, and to deliver the goods without payment of the freight, his right to resort to the shipper still remains. Wooster et al. v. Tarr et al., 8 Allen (Mass.) 270, 85 Am. Dec. 707; Holt et al. v. Westcott et al., 43 Me. 445, 69 Am. Dec. 74; Christy v. Row, 1 Taunton, 300; Shepard v. De Bernales, 13 East, 565; Domett v. Beckford, 5 Barn. & Adolp. 223.

So it was said in Jobbitt v. Goundry, 29 Barb. (N. Y.) 509, 511:

"It seems to be established that a clause in a bill of lading, which directs the carrier to collect the freight of the consignee of the goods, on delivery, does not, in case of the carrier's neglect to collect of him, discharge the consignor's liability to pay the same."

See, also, Collins v. Union Transfer Company, 10 Watts (Pa.) 384. I am impressed, therefore, that the clause under consideration, as

shown by the libel, namely, "that such freight was to be collected * * * at the point of destination and delivery," is tantamount to a direction only to the owner to collect such freight at destination, but that it does not impose upon him such an obligation to do so that his failure in that regard would disentitle him to look to the shipper, notwithstanding, for the payment of such freight. This does not overlook the theory of counsel that the Chinamen are the real principals and the libelant their surety for the payment of such freight; but it does not help the surety, as it is only obligated as the principal is obligated, and can claim no different effect for the contract than the principal, and therefore, when the agreement of the parties allows the shipowner to waive the lien for freight and look to the principal solely, the surety cannot complain, because its suretyship relates to the very same contract. It is bound as its principal is bound, and the duties and obligations of the shipowner are not changed that there was a surety also for the payment of such freight. If the lien continued to assert itself, the surety would be subrogated to that interest in place of the shipowner; but the relations of the lien do not change the duties and obligations of the owner.

Such being the nature of the lien that the Portland and Asiatic had upon the flour for the freight charges, and such its rights and obligations, it not only waived its lien, as it had a right to do, but it lost it absolutely when it abandoned the cargo to the underwriters, as it thereby surrendered possession, thus depriving itself of an essential in the retention of such lien. The lien being lost, the alleged fact, which must be taken as true, that the proceeds of the salved flour came into the Yokohama Specie Bank to the joint credit of the agents of the Portland & Asiatic and the assurance company, could not be effective to restore it, so that there is no lien upon such proceeds, into whosesoever hands they have come. Without the lien, it is manifest that there could be no subrogation, and consequently the libelant can lay no claim to the fund now in the hands of the assurance company, which represents the salved flour. The allegation that no abandonment of such flour was ever made by libelant to insurers must be read in connection with the averment that the Portland & Asiatic abandoned the cargo to the underwriters, which is tantamount to saying that the shipowners abandoned possession; and this is equivalent to an abandonment of the lien.

There is, however, another provision in the bill of lading that is pertinent, if not of vital importance, in the present inquiry. It is the sixth as enumerated in the libel, and is as follows: "The several freights and primages to be considered as earned, steamer or goods lost or not lost, at any stage of the entire transit." In the case of Nelson et al. v. Association for the Protection of Commercial Interests, etc., 43 L. J. (N. S.) 218, the bill of lading read: "Freight for the said goods to be paid in Liverpool [the point of destination] by the consignees, as per margin, ship lost or not lost." The shipowners abandoned the voyage, as the Portland & Asiatic did in the present instance, and the respondent salved a portion of the goods. Upon these the shipowners claimed a lien, after they had been sent to their

destination by the salvors, and it was held by the court that they were not so entitled. In determining the cause, Brett, one of the justices, says:

"Upon the arrival of the goods at the port of destination, no lien existed, for the goods were forwarded by other persons than the plaintiffs. If the shippers were bound to pay the freight, whether the ship was lost or not lost, there was no lien at all, for the right to lien does not arise unless the payment of the freight is to be on the delivery of the cargo; if the freight is payable without delivery of the cargo, lien does not accrue."

That case differs from the one at bar only in the fact that by the bill of lading here the parties have expressly agreed that the carrier should have a lien for all freights; but, as I have seen, the agreement does not vary the nature or effect of the lien, and if therefore the lien was lost in that case by abandonment of the goods to the respondent, who salved a portion of them, it was lost in this case by an abandonment to the underwriters.

I am of the opinion that the libel is without merit, and the exception will therefore be sustained.