Argued March 28, reversed and decree entered April 23, 1918.

# WASCO CO. *v.* NEW ENGLAND EQUITABLE INS. CO.

### (172 Pac. 126.)

**Subrogation—Nature of Right—When not Enforced.**

1. Subrogation is not a matter of strict right, nor does it necessarily rest on contract, but is purely equitable in its nature; and, since it is a creature of equity, it will not be enforced where it will work injustice to the rights of those having equal equities.

   [As to the right of subrogation, see note in 99 Am. St. Rep. 474.]

**Subrogation—Right to Benefits—Surety for Public Contractor.**

2. As between a contractor's surety, the contractor, and a county employing a contractor, the surety paying claims against the contractor in default may claim the benefits of subrogation, because it has paid debts due to third persons acting on compulsion and not as a mere volunteer.

**Subrogation—Paid Surety—Right to Subrogation.**

3. A paid surety may claim benefits of subrogation.

**Assignments—Money Due Public Contractor—Written Order—"Equitable Assignment."**

4. A written order by a contractor to a county to pay a bank money due on a monthly estimate of work done and "all retained percentage" was an "equitable assignment" of the designated money.

**Subrogation—Surety of Public Contract—Priority Over Assignment.**

5. Money due on a contract, but retained by a county until completion and acceptance of work, was by written order assigned by the contractor to a bank in consideration of money loaned the contractor

and used by him to pay for labor and material which he was bound by his contract to pay for. The contractor's bond, as required by law, obliged the surety to pay for labor and material and also to complete the work. The contract provided, as required by Laws of 1913, page 251, for retention of the money assigned until completion and acceptance of the work. *Held*, that on the contractor's default, until claims for labor and material were paid, the county's right to the fund assigned was superior to that of the assignee bank, and that when the contractor's surety paid for labor and material as required, it was entitled to be subrogated, as against the bank, to the rights of the county as of date of its contract, and hence the surety's right to the fund was superior to the assignment to the bank, which was bound to know, when it voluntarily loaned its money, of the surety's equity in the funds reserved.

From Wasco: William L. Bradshaw, Judge.

Department 1.

Wasco County brought this suit in interpleader so that the court could decide whether the sum of $920 held by the county should be paid to the New England Equitable Insurance Company, a corporation, hereinafter called the Insurance Company, or to the French & Company Bank, a corporation, hereinafter referred to as the bank.

On June 14, 1915, Henry Cromer entered into a contract to construct a certain highway for the county. A bond, signed by the contractor as principal and the Insurance Company as surety, was delivered to the county, as required by Chapter 142, Laws of 1913, and was filed in the office of the county clerk on June 17, 1915. The contract obligated the contractor, as required by statute, to pay all persons supplying labor or material for the prosecution of the work: Chapter 61, Laws 1913. The written contract also provided that " * * the partial payments under this contract and the final payment thereon shall be as provided by" Chapter 142, Laws of 1913. The bond was given to secure the performance of the contract and payment to all persons supplying labor or material for the prosecution of the work provided for in the contract. Cromer

entered upon the performance of the contract and constructed a portion of the highway.   Monthly estimates were made of the work done by Cromer, and the county paid him 75 per cent of the amount earned as shown by such estimates and retained the remaining 25 per cent as stipulated by the written contract between Cromer and the county and as required by Chapter 142, Laws of 1913, then in force.   Cromer continued in the performance of his contract until about September 10, 1915, when he was obliged to quit because his equipment had been attached by creditors.   A voluntary petition in bankruptcy was filed by Cromer on October 7, 1915, and he was subsequently adjudged a bankrupt. Negotiations between the county and the Insurance Company resulted in an agreement, on October 25, 1915, terminating the contract with Cromer and releasing the Insurance Company from its obligation to complete the highway upon payment by it of all the outstanding labor and material claims against the contractor.   The Insurance Company paid claims made against Cromer, and approved by him, totaling $3,907.22.

On August 5, 1915, the bank loaned $200 to Cromer and took his promissory note for that amount, and at the same time Cromer signed and delivered to the bank an order directing the county to " * * pay to French & Company, Bankers, all money due on August estimate for work done on the J. T. Harper Road Contract.   Please also pay all retained percentage upon completion of contract."   The order was presented to the county and filed in the office of the county clerk on August 6, 1915.   Cromer borrowed an additional $800 from the bank on August 11, 1915, upon his note for that amount.   Cromer "got this money from French & Company on the representations that it was to pay

bills for labor and material for the construction of the road." The money loaned to the contractor upon the two notes was placed to his credit in the bank and was checked out by him for labor performed upon and material furnished for the road. When the $200 note was given it was understood between the bank and Cromer that he was "to have $800 more"; and the order upon the county "was given to reimburse them (the bank) for the money gotten on both of these notes." When Cromer discontinued work the county had in its hands the sum of $920 which it had retained out of the monthly estimates made during the progress of the work. The complaint filed by the county was accompanied with a tender of $920 to the clerk of the court. The Insurance Company and the bank each answered and each asserted the right to receive the money. The decree of the court was for the bank and the Insurance Company appealed.

REVERSED.   DECREE ENTERED.

For appellant there was a brief over the names of *Mr. Charles A. Hart* and *Messrs. Carey & Kerr,* with an oral argument by *Mr. Hart.*

For respondent there was a brief and an oral argument by *Mr. William H. Wilson.*

For defendant, J. L. Harper, Trustee, there was a brief submitted over the name of *Mr. Carlton L. Pepper.*

For complainant, County of Wasco, there was a brief presented over the names of *Mr. W. A. Bell* and *Mr. Francis V. Galloway,* District Attorney.

HARRIS, J.—A representative of the Insurance Company testified that the surety disbursed $3,907.22

in settlement of labor and material claims and that "all bills for labor and material were O. K.'d by Mr. Cromer before we paid them." Cromer testified that the moneys paid by the Insurance Company "covered material and labor and supplies," and that "about $1,200 was labor." Although it may be assumed, without deciding, that neither the bill of Buskuhl Brothers for $405.94 nor the claim of T. C. Murray for $308.99 embraced labor or material for which the Insurance Company was liable on its bond, nevertheless the evidence clearly and convincingly shows that the Insurance Company paid out more than $920 on account of labor and material claims for which it was liable.

1. The question for decision is whether the Insurance Company or the bank is entitled to receive the $920 which the county had reserved from the monthly estimates. The Insurance Company resorts to the doctrine of subrogation to support its claim, while the bank contends that countervailing equities preclude the application of the rule of subrogation. Subrogation is not a matter of strict right, nor does it necessarily rest on contract, but it is purely equitable in its nature, and since it is a creature of equity it will not be enforced where it will work injustice to the rights of those having equal equities: *First Nat. Bank* v. *City Trust Safe Deposit & Surety Co.,* 114 Fed. 529, 533 (52 C. C. A. 313); *Portland Flouring Mills Co.* v. *Portland & Asiatic S. S. Co.,* 145 Fed. 687, 691; *National Surety Co.* v. *State Saving Bank,* 156 Fed. 21 (14 L. R. A. (N. S.) 155, 162, 84 C. C. A. 187); 37 Cyc. 363; Stearns on Suretyship, 463. In Spencer on Suretyship, Section 133, the author says:

"The right of subrogation may be generally described as the equity by which a person who is secondarily liable for a debt and has paid the same, is put

in the place of the creditor so as to entitle him to make use of all the securities and remedies possessed by the creditor, in order to enforce the right of exoneration or indemnification as against the principal debtor.''

A clear enunciation of the nature of subrogation appears in the much quoted opinion delivered by Chancellor JOHNSON in *Gadsden* v. *Brown,* Speer's Eq. (S. C.), 37, where it is said that:

''The doctrine of subrogation is a pure unmixed equity, having its foundation in the principles of natural justice, and from its very nature, never could have been intended for the relief of those who were in a condition in which they were at liberty to elect whether they would or would not be bound, and as far as I have been enabled to learn its history, it never has been so applied. If one with the perfect knowledge of the facts, will part with his money, or bind himself by his contract, in a sufficient consideration, any rule of law which would restore him his money or absolve him from his contract, would subvert the rules of social order. It has been directed in its application exclusively to the relief of those that were already bound, who could not but choose to abide the penalty. Sureties, for example, who have become bound, are amongst the especial objects of its care. Thus, if a surety pays the debt of his principal, he is entitled to stand in the place of the creditor, and to have the benefit of all securities, funds, liens and equities, to which the creditor was entitled.''

Chancellor WALWORTH has tersely stated in *Sandford* v. *McLean,* 3 Paige Ch. (N. Y.) 117, 122 (23 Am. Dec. 773), that

''it is only in cases where the person advancing money to pay the debt of a third party, stands in the situation of a surety, or is compelled to pay it to protect his own rights, that a court of equity substitutes him in the place of the creditor, as a matter of course, without any agreement to that effect.''

2. While in some of its phases the doctrine of subrogation seems to have been expanded in recent years, it is not now necessary, nor would it be proper in the instant case, to attempt to fix the exact limits of its application, but it is sufficient to say that as between the Insurance Company, the contractor and the county, the surety is in a position to claim the benefits of subrogation because it has paid debts due to third persons and when paying such debts it acted on compulsion and not as a mere volunteer: *In re Fowble,* 213 Fed. 676, 680; Sheldon on Subrogation (2 ed.), 4.

3. The fact that the Insurance Company is a compensated surety does not affect its right to claim the benefits of subrogation. It is true that the rule of *strictissimi juris,* which is generally available to those who are sureties without compensation, is usually relaxed when applied to a paid surety. In this jurisdiction the rule is that a hired surety must show that his rights have been injuriously affected before he can defeat his contract of suretyship: *Neilson* v. *Title Guaranty & Surety Co.,* 81 Or. 422, 427 (159 Pac. 1151). A court of equity grants the right of subrogation because the surety has paid the debt of the principal, and the right of subrogation is not dependent upon whether the surety was or was not paid to sign the bond. It is enough that the surety was obliged to pay and did pay the debt: *Lewis' Admr.* v. *United States Fidelity & Guaranty Co.,* 144 Ky. 425 (138 S. W. 305, Ann. Cas. 1913A, 564); *National Surety Co.* v. *Berggren,* 126 Minn. 188 (148 N. W. 55).

4, 5. The bank relies upon the rule that subrogation will not be allowed where it will work injustice to the rights of those having equal equities: *First Nat. Bank* v. *City Trust, Safe Deposit & Surety Co.,* 114 Fed. 529, 533 (52 C. C. A. 313). The bank contends that the

written order signed by Cromer directing the county to pay to the bank all money due on the August estimate and "all retained percentage" operated as an equitable assignment of the fund and entitles the bank to be paid in full out of the fund to the exclusion of the surety and all general creditors of the contractor. The written order may be regarded as an equitable assignment of the designated moneys: *McDaniel* v. *Maxwell,* 21 Or. 202 (27 Pac. 952, 28 Am. St. Rep. 740) ; *Willard* v. *Bullen,* 41 Or. 25, 33 (67 Pac. 924, 68 Pac. 422) ; *Wakefield, Fries & Co.* v. *Parkhurst,* 84 Or. 483, 486 (165 Pac. 578). The money which Cromer borrowed from the bank was actually used to pay for labor and material furnished during the prosecution of the work; and the bank contends that the surety received the benefit of the bank's money and that, therefore, it would be inequitable to permit the surety to be subrogated to the rights of the county and thus permit the surety to reap where the bank has sown. All parties would probably concede that the Insurance Company would be entitled to claim the benefits of subrogation in the absence of the bank, and hence the question for decision is whether the written order plus the fact that the money which was loaned upon the faith of the written order was actually used to pay for labor performed upon and material furnished for the work, wrought such an equitable assignment of the fund as to preclude the surety from claiming the benefits of subrogation. The inquiry naturally involves an examination of the relative rights of the parties to the fund and a consideration of the fundamental reasons upon which those rights are based.

By his written contract Cromer agreed to pay all claims for labor and material furnished during the prosecution of the work and also to complete the road.

By its bond the surety obligated itself to pay all labor and material claims not paid by Cromer and to complete the contract if Cromer did not. The law required this bond to be given and directed that it should contain these provisions. The written contract also provided for monthly estimates of the work and that 75 per cent of the amount earned each month should be paid to Cromer while, the remaining 25 per cent should be retained by the county "until the completion and acceptance of said work"; and the law also required this provision to be written into the contract: Chapter 142, Laws 1913. Since the bank was bound to know the law it is deemed to have known that the contract with Cromer provided that 25 per cent of each monthly estimate should be reserved by the county; that a bond was given and that the bond obligated the surety to pay all claims for labor and material. Moreover, the bank did in truth know that the county had retained and would continue to retain a percentage of each monthly estimate because the very language of the written order imports such knowledge. It must be remembered, too, that the money in controversy includes nothing but the 25 per cent reserved out of the monthly estimates.

The percentage reserved by the county out of each monthly estimate served to secure the county against any loss it might sustain on account of the nonperformance of the contract; and when Cromer abandoned his contract the county had a right to hold this fund to secure itself against any damages that might have resulted from a nonperformance of the contract by Cromer: *First Nat. Bank* v. *O'Neill Engineering Co.* (Tex. Civ. App.), 176 S. W. 74; *First Nat. Bank* v. *City Trust, Safe Deposit & Surety Co.*, 114 Fed. 529, 531 (52 C. C. A. 313); *Prairie State Nat. Bank* v.

*United States,* 164 U. S. 227, 232 (41 L. Ed. 412, 17 Sup. Ct. Rep. 142); *O'Neill* v. *Title Guaranty & Trust Co.,* 191 Fed. 570, 573 (113 C. C. A. 211); *In re Scofield Co.,* 215 Fed. 45, 50 (131 C. C. A. 353). The right of the county to retain a specified percentage dates from the time the contract was entered into and it must be conceded that until the claims for labor and material are paid the county's right to the fund is superior to that of the bank claiming by an equitable assignment from the contractor.

When the Insurance Company fulfilled its obligations and paid the debts incurred by Cromer for labor and material it was entitled to call upon a court of equity and be subrogated to the rights which the county could have asserted against the fund: *Derby* v. *United States Fidelity & Guaranty Co.,* 87 Or. 34 (169 Pac. 500); *Prairie State Nat. Bank* v. *United States,* 164 U. S. 227, 232 (41 L. Ed. 412, 17 Sup. Ct. Rep. 142); *Reid* v. *Pauly,* 121 Fed. 652, 657 (58 C. C. A. 152); and the right of subrogation dates back to the time when the Insurance Company entered into the contract of suretyship: *Derby* v. *United States Fidelity & Guaranty Co.,* 87 Or. 34 (169 Pac. 500, 503); *Prairie State Nat. Bank* v. *United States,* 164 U. S. 227 (41 L. Ed. 412, 17 Sup. Ct. Rep. 142); *Henningsen* v. *United States Fidelity & Guaranty Co.,* 143 Fed. 810, 814 (74 C. C. A. 484); *Henningsen* v. *United States Fidelity & Guaranty Co.,* 208 U. S. 404, 411 (52 L. Ed. 547, 28 Sup. Ct. Rep. 389); *First Nat. Bank* v. *City Trust, Safe Deposit & Surety Co.,* 114 Fed. 529, 532 (52 C. C. A. 313); *National Surety Co.* v. *Berggren,* 126 Minn. 188 (148 N. W. 55, 57); *In re Scofield Co.,* 215 Fed. 45, 50 (131 C. C. A. 353); *In re P. McGarry & Son,* 240 Fed. 400, 402. If the right of the county to hold and to apply the moneys is superior to the claim of the bank

and if by paying the claims for labor and material the surety is subrogated to the right of the county, as of the date of the contract of suretyship, it necessarily and inevitably follows that the right asserted by the surety is superior to the claim made by the bank.   The rule established by this court in *Derby* v. *United States Fidelity & Guaranty Co.,* 87 Or. 34 (169 Pac. 500), and approved by the overwhelming weight of authority entitles the surety to assert the benefits of subrogation as against all moneys which the person named as obligee in the bond owes the contractor at the time the latter abandons performance of his contract; but the right of subrogation is particularly applicable to such funds as by the terms of the contract are reserved and retained until complete performance and acceptance of the work.   The reserved fund is as much for the indemnity of the surety as it is for the security of the owner for whom the work is to be performed and an equity in such reserved fund is raised in behalf of the surety: *First Nat. Bank* v. *City Trust, Safe Deposit & Surety Co.,* 114 Fed. 529, 531 (52 C. C. A. 313); *O'Neill* v. *Title Guaranty & Trust Co.,* 191 Fed. 570, 573 (131 C. C. A. 211); *In re Scofield Co.,* 215 Fed. 45, 50 (131 C. C. A. 353).   The nature of the right which the surety has in the reserved fund is illustrated and emphasized by the general rule applicable to hired as well as to other sureties, that the surety is discharged from the bond if the owner for whom the work is being performed fails to retain the percentage fixed by the terms of the contract: *Neilson* v. *Title Guaranty & Surety Co.,* 81 Or. 422, 428 (159 Pac. 1151); *O'Neill* v. *Title Guaranty & Trust Co.,* 191 Fed. 570, 573 (113 C. C. A. 211); *Prairie State Nat. Bank* v. *United States,* 164 U. S. 227, 233 (41 L. Ed. 412, 17 Sup. Ct.

Rep. 142); Stearns on Suretyship, § 274; 1 Brandt on Suretyship (3 ed.), § 439. The equity which the surety has in such funds as are retained, under the agreement with the contractor, has its inception at the time when the surety enters into the contract of suretyship, and hence the contractor can neither supplant this equity nor strip it of its priority by borrowing money from some person not obliged to lend and assigning the funds to secure the loan.

When the bank loaned its money it knew that before Cromer entered upon the performance of his contract he had given a bond signed by a surety and that the law required the county to reserve 25 per cent of each monthly estimate. From the date of the contract of suretyship the bank was bound to know that the Insurance Company had an equity in the funds to be reserved; and when the bank loaned its money it did something that it was not obliged to do and it must be deemed to have acted with a full knowledge of the right of the surety. The contractor and the bank could not create a lien in favor of the bank upon the reserved fund and make it paramount to a prior and then existing lien of the surety: *First Nat. Bank* v. *City Trust, Safe Deposit & Surety Co.,* 114 Fed. 529, 532 (52 C. C. A. 313); *Hardaway & Prowell* v. *National Surety Co.,* 150 Fed. 465, 473 (80 C. C. A. 283); affirmed in 211 U. S. 552, 561 (53 L. Ed. 321, 29 Sup. Ct. Rep. 202); *Title Guaranty & Surety Co.* v. *Dutcher,* 203 Fed. 167, 169; *Illinois Surety Co.* v. *City of Galion,* 211 Fed. 161, 163; *In re P. McGarry & Son,* 240 Fed. 400, 402; *Columbia Digger Co.* v. *Sparks,* 227 Fed. 780, 784 (142 C. C. A. 304); Stearns on Suretyship, 482.

It follows that the Insurance Company is entitled to be subrogated to the right of the county. The decree

of the Circuit Court is reversed and a decree will be entered awarding the $920 to the Insurance Company.

REVERSED.    DECREE ENTERED.

McBRIDE, C. J., BENSON and BURNETT, JJ., concur.